# IN THE COURT OF APPEALS OF IOWA

No. 23-1852
Filed March 19, 2025

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**JAMES RUSSELL ELLIS,**
Defendant-Appellant.

_____

Appeal from the Iowa District Court for Plymouth County, Tod J. Deck (State's motion for continuance) and Zachary S. Hindman (Defendant's motion to dismiss, motion for substitution of counsel, and motion for new trial), Judges.

A defendant found guilty of sexual abuse in the third degree appeals his conviction, raising multiple claims of procedural error. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Rachel C. Regenold, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Timothy M. Hau, Assistant Attorney General, for appellee.

Heard by Ahlers, P.J., and Badding and Buller, JJ.

**BADDING, Judge.**

After more than a year of extended deadlines and continuances, James Ellis was finally tried and found guilty by a jury of third-degree sexual abuse. On appeal from his conviction, Ellis brings multiple claims of procedural error, challenging the (1) continuance of his case beyond the one-year speedy trial deadline, (2) denial of his motions for a mistrial and new trial after prospective jurors saw him in shackles and handcuffs, and (3) denial of his motion for substitute counsel. We affirm the court's rulings on those issues in this long-lived and procedurally tangled case.

**I.    Background Facts and Proceedings**

In May 2019, James Ellis, Geoff Oolman, and Oolman's girlfriend, R.H., spent several days and nights using methamphetamine and hiding out from the police, who were looking for Oolman. After Oolman was caught, Ellis took R.H. back to her apartment. There, she fell asleep for the first time in three days. When R.H. woke up, her pants were off, and Ellis was lying on top of her with his penis exposed. R.H. screamed at Ellis to leave. Once he was gone, R.H. called a friend, who drove her to the hospital. Staff there examined R.H. and collected evidence from her. Male DNA recovered from R.H.'s vaginal swab was later matched to Ellis.

Two years later, the State charged Ellis with third-degree sexual abuse in violation of Iowa Code section 709.4(1) (2019). Ellis, who was released on bond, filed a written arraignment on September 20, 2021. The district court set trial for March 2022. That date was continued twice on Ellis's motion and a third time at the request of the State. The court also granted seven motions that Ellis filed to

extend the deadlines for his pretrial motions and notices. Trial was ultimately scheduled for September 13, 2022—one week shy of Ellis's one-year speedy trial deadline. *See* Iowa R. Crim. P. 2.33(2)(c).

In mid-August, Ellis made a flurry of pretrial filings. First, under Iowa Code section 691.2, Ellis filed a notice requesting that employees from the Iowa Division of Criminal Investigation (DCI) who tested the DNA samples collected from Ellis and R.H. testify in person at his trial. He also filed motions requesting disclosure of R.H.'s confidential medical records and an opportunity to depose one of the State's witnesses, as well as a notice of potential defense witnesses. And finally, on August 26—the last day of his extended deadline for pretrial motions—Ellis moved to suppress a DNA sample collected from him nearly two years earlier, arguing that the evidence was obtained under an expired warrant.

On September 2, the State moved to continue trial and extend the speedy-trial deadline. As "the primary basis" for its motion, the State asserted that one of the witnesses from the DCI whose testimony Ellis had demanded would not be available for the September 13 trial. The State also explained it had secured a new warrant for Ellis's DNA but would need more time to obtain and test a sample. Additionally, the State noted that Ellis's witness disclosure was incomplete and that the cumulative delay in bringing the case to trial was caused in part by Ellis's own motions to continue. Ellis resisted the State's motion.

At a hearing on the motion, the court noted the State's desire to develop new DNA evidence in response to Ellis's warrant challenge was "[not] persuasive at all." But it found other factors favored a continuance, including Ellis's prior requests for extensions of time, the need for a hearing on the pending motion to

suppress, and the court's own concerns about "room availability and staffing." Weighing all these considerations, the court found good cause to grant the State's continuance and extend the speedy-trial deadline. It continued trial to November 8—one year and seven weeks after Ellis's arraignment. Although the State was ready to proceed as early as September 22, the court explained that earlier dates were unavailable due to a "scheduling logjam" caused by other jury trials set for the intervening weeks.

On October 25, Ellis moved to dismiss his case based on a violation of his speedy-trial rights.[1] Although the court agreed with the State that the issue had already been resolved by a different judge, it elaborated the reasons supporting good cause for the seven-week extension. Those included the unavailability of the State's witness, Ellis's incomplete disclosures, a competing murder trial, Ellis's late-filed motion to suppress, the "[not] excessively long" delay, and the lack of prejudice to Ellis.

On November 3, 2022—five days before trial—Ellis asked for another continuance. The district court denied that motion, and trial commenced on November 8. Ellis, however, did not appear. He was apprehended the same day, and trial was once again rescheduled—this time for January 31, 2023.

Over the next few months, Ellis cycled through several court-appointed attorneys. The attorney who represented him from the beginning of the case sought to withdraw after Ellis failed to appear at his first trial. A second attorney

---

[1] In the time that elapsed between the hearing on the State's motion to continue and Ellis's motion to dismiss, the State obtained a new buccal swab from Ellis, mooting his prior motion to suppress.

had a conflict of interest, and a third cited a "breakdown of the attorney-client relationship" from his representation of Ellis in a different matter. Ellis's fourth attorney was appointed at the end of December 2022. Just a few weeks later, Ellis filed a pro se motion asking for a replacement. The district court denied the motion, noting "the proximity of the trial date," "the age of th[e] case," and "the history of [Ellis's] attorney/client relationships."

In the days leading up to the second attempt at trial, Ellis's attorney filed a motion asking that Ellis—who remained in custody—be permitted to appear in "civilian" clothes. The district court granted that request. It also entered a separate order discussing its expectations for Ellis's treatment at trial, including "that arrangements will have to be made with the Plymouth County Sheriff to ensure that the potential jurors and jurors are not aware of the fact of the Defendant's custody." On the first morning of trial, however, Ellis was transported to the Plymouth County courthouse in handcuffs, ankle shackles, and a body chain. Although he wore civilian clothes, some of Ellis's restraints were visible as a sheriff's deputy escorted him through the public areas of the courthouse. His path crossed briefly through the atrium on the third floor, where several members of the jury pool were waiting for jury selection to begin.

The prosecutor immediately notified the court about Ellis's exposure to the jury pool, and the deputy who transported Ellis to the courthouse provided more details on the record. The deputy testified that he had been directed to ensure Ellis was dressed in "street clothes" and at the courthouse at 8:20 a.m., but the deputy had not received word that Ellis should be transported through the courthouse without restraints. Ellis's counsel moved for a mistrial, arguing Ellis's

appearance in the atrium had tainted the entire jury pool. The district court reserved ruling but encouraged the parties to explore the possibility of prejudice during jury selection.

The State did not mention the issue during its voir dire of the potential jurors, but defense counsel did, asking, "Did anybody see Mr. Ellis arrive this morning?" Four jurors raised their hands. Counsel then pressed one about what she saw:

> Can you tell me in your own words what you saw?
> JUROR NO. 1: Yes. I saw him come in. I was standing at the back and I saw him come in towards the front.
> [DEFENSE COUNSEL]: Okay. And what about that? I need some more details.
> JUROR NO. 1: It appeared that he had handcuffs.

After the prosecutor requested a sidebar, the parties moved to the court's chambers and individually questioned the four potential jurors who had seen Ellis arrive. Each affirmed that they would disregard their observations and comply with the court's instructions on the presumption of innocence. Three of them served on the jury that would later find Ellis guilty.

Following his conviction, Ellis moved for a new trial, arguing among other grounds that his exposure to the jury while in shackles violated his due process rights. The district court denied relief in a thorough written ruling that also addressed its reserved ruling on Ellis's motion for mistrial. Ellis now appeals, challenging: (1) the seven-week extension of his one-year speedy trial deadline, (2) the denial of his motions for mistrial and new trial after members of the jury pool saw Ellis in shackles, and (3) the denial of his request for substitute counsel.

## II.    Analysis

### A.    Speedy Trial

Iowa Rule of Criminal Procedure 2.33 provides in part that "[a]ll criminal cases must be brought to trial within one year after the defendant's initial arraignment."  Iowa R. Crim. P. 2.33(2)(c) (2022).  A charge that is not tried within the one-year window generally must be dismissed.  *See State v. Rodriguez*, 511 N.W.2d 382, 383 (Iowa 1994).  But this rule is not without exceptions.  The district court may extend the deadline to commence trial if the State shows that (1) the defendant has waived the right to speedy trial, (2) the delay is attributable to the defendant, or (3) other "good cause" exists.  *Id.*; *see also State v. Elder*, 868 N.W.2d 448, 453 (Iowa Ct. App. 2015).

Challenging both the district court's grant of the State's motion to continue and denial of his motion to dismiss, Ellis claims the State failed to establish good cause.  This court reviews a good-cause determination for an abuse of discretion.  *See State v. McNeal*, 897 N.W.2d 697, 703 (Iowa 2017).  In the speedy-trial context, the district court's discretion is "circumscribed by the limited exceptions" available under Rule 2.33.  *State v. Miller*, 637 N.W.2d 201, 204 (Iowa 2001); *accord Elder*, 868 N.W.2d at 453.[2]

---

[2] Ellis argued in his appellate brief that because his speedy-trial challenge implicates a constitutional right, we should apply a de novo review.  The Iowa Supreme Court rejected that argument in *State v. Grady*, 231 N.W.2d 869, 873 (Iowa 1975).  Since then, the court has consistently held that a good-cause determination is reviewed for abuse of discretion.  *McNeal*, 897 N.W.2d at 703; *accord State v. Winters*, 690 N.W.2d 903, 907 (Iowa 2005) (reviewing for abuse of discretion); *Miller*, 637 N.W.2d at 204 (same); *State v. LaPlant*, 244 N.W.2d 240, 242 (Iowa 1976) ("[R]eview of a determination of good cause is not de novo.").  As Ellis acknowledged at oral argument, we are not free to rewrite that standard.

The key focus of the good-cause analysis is "the reason for the delay." *McNeal*, 897 N.W.2d at 704 (citation omitted). Of course, "delay cannot be evaluated entirely in a vacuum," and so courts also consider "surrounding circumstances such as the length of the delay, whether the defendant asserted his right to a speedy trial, and whether prejudice resulted from the delay." *Id.* (citation omitted). But these considerations are relevant "only insofar as they affect the strength of the reason for delay." *State v. Petersen*, 288 N.W.2d 332, 335 (Iowa 1980). As our supreme court has explained:

> This means that, to whatever extent the delay has been a short one, or the defendant has not demanded a speedy trial, or is not prejudiced, a weaker reason will constitute good cause. On the other hand, if the delay has been a long one, or if the defendant has demanded a speedy trial, or is prejudiced, a stronger reason is necessary to constitute good cause.

*McNeal*, 897 N.W.2d at 704 (quoting *Miller*, 637 N.W.2d at 205). According to Ellis, none of the reasons submitted by the State established good cause to extend the speedy-trial deadline. We disagree.

The State points to the unavailability of its DCI criminalist as the chief justification for extension of the rule 2.33 deadline. Several cases recognize that circumstance as a basis for good cause. *See id.* at 705–06 (finding good cause where a "trial date conflicted with the schedule of at least one material expert witness, a fact which the State brought to the court's attention before trial"); *State v. Todd*, 468 N.W.2d 462, 470 (Iowa 1991) (noting the last available trial date before expiration of the rule 2.33 deadline was unworkable because "some of the State's witnesses would not be available"); *Petersen*, 288 N.W.2d at 335 (finding trial court had good cause to extend the speedy-trial deadline by fourteen days

where one of the State's expert witnesses was on vacation); *State v. Tennant*, No. 17-0648, 2018 WL 2084858, at *2 (Iowa Ct. App. May 2, 2018) (collecting cases in support of district court's finding that the scheduled vacation of a central State witness provided good cause for an extension).

Ellis, however, argues that the State knew its witness was unavailable but needlessly delayed seeking a continuance until shortly before trial. That argument is belied by the record. The State named two DCI criminalists as trial witnesses in its minutes of testimony filed in August 2021. On August 16, 2022, Ellis gave notice of his demand for those witnesses to testify in person. *See* Iowa Code § 691.2(2). The next day, the State filed a motion requesting the court's permission for its DCI witnesses to testify by deposition, citing their unavailability for trial because of a mandatory training. Two days after the district court denied that motion, the State moved for a continuance, arguing that one of those witnesses was essential to its case—the criminalist who "actually performed the testing on the sex assault kit and the buccal swab of Mr. Ellis."

True, the State could have raised its scheduling problem before Ellis's section 691.2 demand. But until the demand was filed, the State may have been planning to rely on the admission of the DNA report without live testimony. *See id.* § 691.2(1) (providing such reports "shall be received in evidence," without live testimony, unless the defendant demands the criminalist to testify at trial). And cases finding good cause based on the unavailability of a material witness do not require that the State be entirely blameless in retrospect. *See McNeal*, 897 N.W.2d at 705 (noting that while the State's "diligence could have been criticized in hindsight," the unavailability of a material expert witness was "enough to justify

a brief extension past the speedy trial deadline"). Ellis does not dispute that the State's criminalist was a material witness. Nor does he claim any prejudice or harm to his defense from the delay. *See id.* at 704 (noting that while this consideration does not eliminate the State's duty to show a valid reason for the delay, the reason does not have to be as strong).

Ellis also argues that cases finding good cause because of unavailable witnesses for the State have generally approved much shorter delays. *Cf. id.* at 699 (eight days); *Petersen*, 288 N.W.2d at 335 (fourteen days); *Tennant*, 2018 WL 2084858, at *2 (thirteen days). The seven-week continuance here, however, was a product of compounding factors that add further support to the court's good-cause findings.

One of those factors was an ongoing first-degree murder trial expected to spill over to the first day of Ellis's trial. In discussing that issue, the court noted that the courthouse only had space for one jury trial and the clerk's office was short-staffed, meaning it was unlikely that Ellis's trial could have started on its scheduled date. *See State v. Stanley*, 351 N.W.2d 539, 541 (Iowa Ct. App. 1984) (finding good cause for a delay where "the unexpected length of a previous trial [left] no other available space for defendant's trial"). And while the State required only a modest extension to produce its DCI witness, conflicts with other trials and defense counsel's upcoming vacation prevented immediate rescheduling. These scheduling conflicts were not the product of chronic court congestion, as Ellis argues, but instead "unique, non-recurring events which create[d] a particular scheduling problem." *State v. Bond*, 340 N.W.2d 276, 279 (Iowa 1983); *cf. Miller*, 637 N.W.2d at 206 (finding court's decision to delay until a "regular" trial date

showed its "deference to the established trial schedule" and not a unique scheduling problem sufficient to extend the speedy-trial deadline).

Considering the reasons advanced by the State within the context of the surrounding circumstances, we find no abuse of the district court's discretion in determining the State had established good cause to extend the speedy-trial deadline.

### B. Exposure of Custodial Status to Jury Pool

The presumption of innocence is "axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Estelle v. Williams*, 425 U.S. 501, 503 (1976) (citation omitted). Consequently, a criminal defendant is "entitled to the indicia of innocence" while in the presence of the jury. *State v. Wilson*, 406 N.W.2d 442, 448 (Iowa 1987). This generally means that a defendant should not be restrained during trial, as "requiring a defendant to appear in shackles before a jury is inherently prejudicial." *Id.* at 449.

Outside of trial proceedings, however, a defendant's right to the indicia of innocence is less robust. Iowa courts distinguish "cases in which the defendant is shackled in the courtroom during trial" from those in which "members of the jury briefly and inadvertently observe the defendant being moved to and from the courtroom area in shackles." *Id.* at 448. In cases of shackling during trial, prejudice is presumed, and "[t]he burden is on the State to show the necessity for physical restraints." *Id.* at 449. But in brief-exposure cases, "the defendant has the burden to show the incident prejudicially affected the jury or that his ability to present his defense was impaired as a result of his being seen in shackles." *Id.* at 448; *accord State v. Ellis*, 350 N.W.2d 178, 183 (Iowa 1984).

This is a case of brief exposure. Ellis was not restrained in the courtroom during trial. But he was wearing shackles on the first morning of trial when he was escorted past several prospective jurors in the courthouse atrium. The district court determined neither a mistrial nor a new trial was warranted because Ellis failed to establish prejudice. It cited the affected jurors' unequivocal promises to be fair and impartial, as well as its modified preliminary instruction on the presumption of innocence and irrelevance of Ellis's custodial status.[3]

"No trial is perfect" when it comes to balancing a defendant's rights against concerns for public safety. *Ellis*, 350 N.W.2d at 183 (quoting *State v. Kile*, 313 N.W.2d 558, 562 (Iowa 1981)). The district court is in the best position to determine "whether a reasonable accommodation of the two interests has been achieved." *Id.* (quoting *Kile*, 313 N.W.2d at 562). Thus, denial of a motion for a mistrial or a new trial on indicia-of-innocence grounds is reviewed for abuse of discretion. *Id.*; *see also Wilson*, 406 N.W.2d at 450. Relevant considerations include: (1) the length of the defendant's exposure to the jury; (2) the circumstances giving rise to the exposure; (3) whether the exposure was inside or outside the courtroom; and (4) whether "the jury was otherwise aware" the defendant was in custody. *Ellis*, 350 N.W.2d at 183.

---

[3] That instruction stated in part:
> The defendant is presumed innocent and not guilty. This presumption of innocence requires you to put aside all suspicion which might arise from the defendant's arrest, any time he may have been in custody after the arrest, the charge, or the present situation of the defendant. The presumption of innocence remains with the defendant throughout the trial unless the evidence establishes guilt beyond a reasonable doubt as to each count.

Courthouse security cameras recorded Ellis's brief journey through the courthouse atrium. He wore handcuffs, ankle shackles, and a body chain. His clothing was otherwise ordinary. A large coat draped over his shoulders obscured the body chain and handcuffs. However, the position of Ellis's hands implied restraint, the chain between his ankles was visible, and he was shuffling a bit. A sheriff's deputy followed close behind Ellis, although the deputy did not guide or touch him. Several prospective jurors seated in the atrium turned their heads as Ellis passed; others appeared not to notice him. Ellis's exposure to the pool lasted only a matter of seconds.

Ellis contends this incident prejudiced his defense, emphasizing that three of the potential jurors who saw him in shackles later sat on his jury. But, following an examination of those jurors, the district court concluded they were prepared to disregard their observations. Ellis points to no evidence that they were prejudicially affected by the brief sight of his restraints. *See Wilson*, 406 N.W.2d at 448. Notably, Ellis did not use his peremptory strikes to remove the three jurors he claims were affected. And while he hypothesizes that others learned about his custodial status during voir dire, he did not examine them further. *See State v. Webster*, 865 N.W.2d 223, 237 (Iowa 2015) ("[A] party who fails to avail himself or herself of procedures for identifying bias waives later challenges for juror impartiality.").[4]

---

[4] Ellis also asserts that the district court inadequately instructed the jury "how to consider" his appearance in the atrium. But the court's preliminary instructions did mention Ellis's custodial status, and he declined to have that repeated in the final presumption-of-innocence instruction. So we do not consider this argument further.

What remains of Ellis's prejudice argument are the bare circumstances of his appearance in the atrium, and those do not support an inference of prejudice on their own. Ellis was exposed to the jury pool for a matter of seconds. Only his ankle chain was in plain view, although he was dressed in civilian clothing. While his exposure to the jury pool was unfortunate and preventable, it was not of a magnitude that compels a finding of prejudice. *See Ellis*, 350 N.W.2d at 183 (affirming denial of mistrial where two to four jurors briefly observed a manacled defendant being led down the courthouse stairs during transport by officers).

In an overlapping claim of error, Ellis contends that his exposure to the jury was not "inadvertent" but rather a deliberate violation of the district court's pretrial order. Pointing to *Wilson*, he urges us to find that a defendant whose custodial status is revealed to jurors through the deliberate conduct of State or court officials is excused from the requirement of showing prejudice. But while *Wilson* used the label "inadvertent observation" to distinguish the brief-exposure category of cases from those in which a defendant is "actually tried in shackles," it did not suggest that intent is the determinative factor for deciding whether a presumption of prejudice applies. 406 N.W.2d at 448. Nor do other cases addressing brief exposures stand for that rule. *See Ellis*, 350 N.W.2d at 183 (making no finding on whether a restrained defendant was deliberately or inadvertently exposed to jurors while outside the courtroom); *Kile*, 313 N.W.2d at 562–63 (same); *State v. Evans*, 169 N.W.2d 200, 210 (Iowa 1969) (same).

Even if a non-accidental exposure would relieve Ellis of his burden to show prejudice, such a rule would not apply here. Nothing in the record suggests Ellis was escorted through the courthouse in a deliberate attempt to prejudice the jury

or otherwise deny his due process rights. The deputy who transported Ellis testified that he was unaware of the need to keep Ellis's restraints out of public view. The district court found his testimony credible:

> [T]he clear implication of the deputy's testimony (and especially from his demeanor during his testimony) was that he realized, when he saw the prospective jurors in the atrium, that he had made a mistake by having [Ellis] in restraints in the presence of those prospective jurors, and that once he realized his mistake he moved [Ellis] as quickly and directly as possible out of the atrium.

Ellis points to no evidence suggesting his exposure to the jury pool was anything more than an accident.[5] The district court properly denied Ellis relief on this claim.

## C.    Substitute Counsel

On January 13, 2023—about two weeks before his case was set for another attempt at trial—Ellis filed a pro se motion requesting appointment of substitute counsel, alleging "a lack of trust" and "break down of communication" between himself and his attorney. Defense counsel moved to withdraw the same day. She had represented Ellis for less than three weeks and was his fourth court-appointed attorney.

At a hearing on the motions, defense counsel confirmed that she had investigated the facts of the case, conferred with Ellis about trial strategy, and would be prepared to proceed with the scheduled trial. When the district court asked Ellis why he wanted a new attorney, Ellis responded:

> I believe that we have no trial strategy. I have suggested a few things to my attorney, and she's informed me that she believed my strategy was incorrect, which her inference or suggestion of what my trial strategy was [was] incorrect. It's not the strategy that I was

---

[5] Our resolution of this issue should not be viewed as an approval of how Ellis was transported. We urge the sheriff to develop a new procedure for transporting defendants for their jury trials in this county to avoid exposures of this type.

wanting to take. It was just a—suggestions or leadings that I thought would be things to look into or follow.

I don't know how much—we have—we're not seeing eye to eye. I guess I don't know what her strategy is. I don't know what it is. I would be happy to know. The only strategy that I can seem to come up with is that we communicate through mail, which is extremely slow. And she stated to me from the get-go that her intentions were not to put a lot of effort into things or to work hard.

She's been at this long enough that that's not her driving force behind what she does anymore. And she's also seen people that were innocent with my type of charge still become incarcerated and go to prison. And that kind of attitude and approach towards my case is not one that I could get on board with.

If I can't adequately be represented by somebody else and provided adequate time and also the chance to confront my accusers with new representation, as I was not allowed to with this representation either, but if I can't have that done, then what's the point of getting another attorney, I guess? I don't see the Court cooperating in my interest at all in regards to this entire charge. So I feel my words hold little to no weight in this situation anyways.

The district court denied Ellis's request,[6] finding the concerns he expressed did not "rise to the level of [a] complete breakdown of the attorney/client relationship." The court emphasized "the proximity of the trial date," "the age of th[e] case," and "the history of [Ellis's] attorney/client relationships" as additional reasons to deny the motion. It advised Ellis that he could proceed with his attorney or choose to represent himself, but he could not "manipulate or delay the trial" by requesting substitute counsel.

A defendant has the right to be represented by counsel, but not necessarily their counsel of choice. *State v. Mott*, 759 N.W.2d 140, 148 (Iowa Ct. App. 2008). "Where a defendant represented by a court-appointed attorney requests the court appoint substitute counsel, sufficient cause must be shown to justify replacement."

---

[6] Because Ellis's attorney had moved to withdraw on the basis of Ellis's request for new counsel, the court denied that motion as well.

*State v. Tejeda*, 677 N.W.2d 744, 749 (Iowa 2004). Grounds justifying substitution include a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication. *Id.* at 749–50. But "general frustration and dissatisfaction with defense counsel" are not good reasons for substitution. *State v. Boggs*, 741 N.W.2d 492, 506 (Iowa 2007). This court reviews denial of substitute counsel for abuse of the district court's "considerable discretion." *Id.*

The district court was within its discretion to deny Ellis's request for a new attorney. On appeal, Ellis contends that substitution was mandatory because "counsel had not discussed trial strategy with Ellis." But counsel stated otherwise. And Ellis's remarks to the court acknowledge that he had communicated with counsel to some extent, although he was not yet feeling confident in her "attitude and approach." The court was not required to appoint a new attorney for Ellis based on these frustrations. *Mott*, 759 N.W.2d at 149 (finding defendant's "general complaints regarding his dislike of public defenders" and "disagreements over trial strategy" did not compel substitution); *State v. Smith*, No. 22-1901, 2023 WL 5093216, at *2 (Iowa Ct. App. Aug. 9, 2023) (finding that the court was within its discretion to deny a motion for substitute counsel "based solely on [the defendant's] apparent dissatisfaction"). That is especially true given the proximity of trial and the history of delay in Ellis's case. *See Boggs*, 741 N.W.2d at 506 (noting "eleventh-hour requests for substitute counsel are generally disfavored"); *see also State v. Webb*, 516 N.W.2d 824, 828 (Iowa 1994). Because we find no abuse of the court's discretion in denying substitute counsel, we need not address Ellis's claims of prejudice.

**III.     Conclusion**

Finding no abuse of the district court's discretion on any of the claims raised by Ellis on appeal, we affirm his conviction for third-degree sexual abuse.

**AFFIRMED.**